**IN THE COURT OF APPEALS OF IOWA**

No. 25-1364
Filed December 3, 2025

**IN THE INTEREST OF M.A.,**
**Minor Child,**

**S.A., Father,**
    Appellant,

**M.M., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Lynn Poschner, Judge.

A mother and father separately appeal the termination of their parental rights to their child.  **AFFIRMED ON BOTH APPEALS.**

Chira L. Corwin of Corwin Law Firm, Des Moines, for appellant father.

Cole J. Mayer of Des Moines Juvenile Public Defender, Des Moines, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Emily Drenkow Carr of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

Considered without oral argument by Greer, P.J., and Schumacher and Ahlers, JJ.

**GREER, Presiding Judge.**

A mother and father each appeal from the order terminating their parental rights to M.A., born in 2017. On her end, the mother, M.M., does not contest that the State proved the grounds for termination under Iowa Code section 232.116(1)(f) (2025).[1] Instead, she argues the child would be best served if the juvenile court allowed the mother an additional six months to prepare for the child's return to the mother, or, as an alternative, that a guardianship be put in place.[2] She also urges that it is not in the child's best interests to terminate her parental rights.

The father, S.A., who lives out of state and has never met the child in person, appeals asserting the State did not prove the fourth element under section 232.116(1)(f)—that the child could not be placed in the custody of the father at the time of the termination hearing. He also contends that a six-month

---

[1] Under this section, the State must prove that all of these four grounds have occurred:

>   (1) The child is four years of age or older.
>   (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>   (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
>   (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

[2] The mother mentions a guardianship option in her appellate brief but did not request that option in the proceedings below, and she failed to develop any argument about that option in her appellate brief, including who would be the guardian. We do not address her guardianship argument because that claim was neither raised nor decided in the juvenile court proceedings. *See In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) (noting issues must be presented to and ruled upon by the court to preserve error for appeal.).

extension would have provided "time to rectify any potential concerns." Finally, he argues it is not in the child's best interests to terminate his rights. Both parents appeal.

On our de novo review, we find that the State met its burden to show the grounds for termination of parental rights for both the mother and the father and that neither parent met the burden to prove an exception to termination. We also find it is in the child's best interests to terminate her parents' rights and move toward permanency. We affirm.

## I. Background Facts and Proceedings.

In March 2024, the family came to the attention of the Iowa Department of Health and Human Services (HHS) when concerns arose over the child's allegations that she had been sexually abused by her older brother and that the mother was not addressing the child's resulting issues. Although the abuse had been going on for years and the mother knew about it, she did nothing to stop it and, even worse, allowed the older brother to continue as a caretaker of the child.[3] Finally, as others became aware, she took the child to the hospital and child protective services became involved. HHS sought removal of the child from parental custody to a foster family, which was accomplished through a temporary order on May 2, 2024. The child was placed in the temporary legal custody of HHS in June. The child has remained in foster care since that time.

---

[3] The juvenile court found in the termination order that there was clear and convincing evidence that the child was sexually abused multiple times by her brother.

Once involved with the family, HHS also became concerned about the mother's failure to support the child's mental-health needs and the mother locking the child in her bedroom from the outside of the door. When raising these behaviors, the mother became defiant with HHS; discounting the actions and the child's allegations. Two founded child abuse reports related to the mother cited denial of critical care and failure to provide adequate supervision by the mother and a safety plan was put in place. The child was adjudicated a child in need of assistance (CINA) on June 28.

The mother was offered services and ordered to provide a psychosocial evaluation, including an intellectual assessment. HHS noted she had struggled with caring for the child even before HHS's involvement, so HHS offered a parent partner referral and various classes. And although the mother believed the child suffered from a number of psychological and other disorders,[4] in February 2021, after the three-year-old child was evaluated by a psychologist, the report noted that the mother was "invested" in the child being disabled and the child did not have the conditions the mother had described. The only confirmed diagnoses for the child were ADHD and prenatal drug exposure. Yet, before and during the case proceedings, the mother did not engage in any disability and developmental services for the child, and she stopped the child's medications without medical guidance.

The mother also reported that the child was aggressive and would try to wander away from the home, so she installed locks on the outside of the child's

---

[4] The mother reported that the child had been diagnosed with ADHD, autism, bipolar disorder, and may be schizophrenic when she gets older.

bedroom door.  The child reported that she would be locked in her room until her mother and her boyfriend woke up.  Apparently, this had been going on as early as 2021.

The mother was diagnosed with many disorders, including depression, panic attacks, and post-traumatic stress disorder, but she had stopped taking her prescribed medications years before the proceedings here.  To her credit, she had attended therapy since 2022, but she was discharged from seeing that particular therapist in June 2024 for missing appointments.  In August, the mother was evaluated, and it was recommended that she engage in therapy and other services to address anxiety, self-esteem, healthy relationships, and parenting skill development.  Therapy did not resume until end of January 2025.  The mother began seeing a new therapist in May, but the mother had only four appointments with that therapist before the termination hearing.

Turning to the father, he has been twice imprisoned since the child was born and currently is on parole.[5]  At the time of the termination trial, the father had been unemployed for less than a week and was living in Arkansas with his girlfriend.  He started contact with the child after the child was removed to foster care in May 2024 and has maintained regular phone and video contact.  The father blamed the mother for his lack of contact before HHS involvement, but as noted, he has never been with the child in person and never acted as a caretaker.  When proceedings began, the father was living in a place with conditions described as deplorable, but

---

[5] The father testified that he has been in prison two different times; the last imprisonment was for nine months, but because of his stated memory problems, he was not clear about the specific dates.

he claimed to have secured a two-bedroom RV. The father had no driver's license and was not able to utilize the fuel card HHS provided to come to Iowa for any in person visitation with the child.

The State petitioned to terminate the parents' rights, and the juvenile court ultimately held a termination trial over three days in July. The juvenile court terminated both the mother's and father's parental rights, and they separately appeal.

## II.  Standard of Review.

"We review termination proceedings de novo." *In re J.R.*, 20 N.W.3d 839, 843 (Iowa Ct. App. 2025) (en banc). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015). "Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *Id.* "Our primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

## III.  Discussion.

We apply a three-step analysis when reviewing the juvenile court's decision to terminate parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a permissive exception applies and should be exercised to preclude termination. *See In re L.B.,* 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3). We address each parent's appeal separately.

**A. Mother's Appeal.** The mother concedes that the State proved the grounds required to terminate her parental rights. *See L.N.S. v. S.W.S.*, 854 N.W.2d 699, 703 (Iowa Ct. App. 2013) ("Where a party has failed to present any substantive analysis or argument on an issue, the issue has been waived."). Instead, she emphasizes the efforts she has made over the course of these proceedings to improve her parenting deficiencies and requests additional time to show she can "implement what she has learned to be reunified." The mother contends that HHS was seeking perfection from her, not minimal adequacy. She asserts the child's best interests would be served by a six-month extension so she can reunite with the child. She also points to her strong bond with the child as a compelling reason to apply a permissive exception under section 232.116(3).

1. *Best interests.* We take up the mother's argument that it was not in the best interests of the child to terminate the mother's parental rights. *See* Iowa Code § 232.116(2); *see also In re D.S.*, 806 N.W.2d 458, 474 (Iowa Ct. App. 2011) ("Even if a statutory ground for termination is met, a decision to terminate must still be in the best interests of a child after a review of section 232.116(2)."). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). This question would be made easier if there were a clear path toward a permanent home for this child.[6] *See id.* § 232.116(2)(b) (allowing the court to consider "whether the foster family is able and willing to permanently integrate the child into

---

[6] The current foster family is not an adoption option, but HHS was exploring another family who knew the child.

the foster family" when considering best interests). Here, HHS has not yet identified a family willing to adopt. Even so, we are required to address the section 232.116(2) factors to address what is in the child's best interests as it relates to this mother-child relationship. *See In re P.L.*, 778 N.W.2d 33, 40–41 (Iowa 2010).

"We hold no crystal ball, and to some extent, the [best-interests] determination must be made based upon past conduct." *In re M.M.*, No. 16-1685, 2016 WL 7395788, at *4 (Iowa Ct. App. Dec. 21, 2016). Turning to considerations involving the child's long-term needs, several concerns impact our decision. First, the mother looked the other way while the young child was being sexually abused by an older sibling over a period of years. As noted in the HHS termination report to the juvenile court:

> Family preservation services were put in place from 4/4/24 until 5/2/24. Multiple concerns were reported during family preservation on [the mother's] parenting and accountability. Often, [the mother] would appear to defend [the older brother] and state he needs help and an attorney. [The mother] did not believe the sex abuse happened until after the investigation was complete. [The mother] reported to [Family Centered Services] that she informed neighbors and other strangers that her daughter had been sexually abused by her brother.

Yet, despite these findings, the mother had not pursued any treatment or therapy for the child and had not during the proceedings addressed her own lack of engagement. And although the child had been in therapy during these proceedings, it was not until late in the process that the mother even reached out to the child's therapist for an update.

Even shortly before the termination trial in July, the mother's new therapist reported to the HHS social worker that "[the mother] mentioned the concerns

related to this case, but she feels very justified in her actions and there has been little progress addressing the concerns" as she primarily wanted to discuss the remodel of her trailer. And as to her insight, at the termination trial, the mother failed to understand the reasons for the proceedings, testifying that the only reason was the locking of the child in the bedroom. As for the sexual abuse, the mother minimized the abuse by justifying her lack of response as "brothers and sisters . . . play[ing] around" and that the child had only told her that the siblings had "kissed."

Second, as for the safety issue involving the bedroom, HHS summarized in its termination report, the following:

> The Department is concerned with [the mother's] parenting capabilities. [The mother] locked [the child] in her bedroom. [The child] was unable to get out. Prior to removal, [the mother] had a makeshift toilet in [the child's] bedroom and stated this was due to [the child] not being able to make it to the bathroom on time. [The child's] bedroom was directly next to the bathroom. [The mother] had been redirected on multiple occasions she was asked to remove the lock on the door and toilet and did not. [The mother] eventually removed the lock but not the toilet. [The child's] bedroom had writing all over the walls, had minimal items in it, and often the bed would be flipped over or missing sheets and blankets.

Third, the juvenile court also noted various examples where the mother's conversations were inappropriate and caused the child stress: (1) saying that the mother was dying of cancer, although not true; (2) saying the father killed someone in Arkansas, although not proven; and (3) saying that children in the area were all dying from a virus, again not true. The foster parents reported that these conversations caused the child to be stressed and, in some cases, to act out.

In sum, the evidence does not show that the mother has the insight to recognize her parenting deficiencies and has not acted on the services that HHS offered to develop that insight. Once the child was placed in foster care, her school

teacher reported that she saw an immediate change for the better in the child. The child has since been enrolled in special education with additional educational aid to address her educational delays. All of which went to the concern that the mother was not able to understand or take action to meet the child's needs. Likewise, the child has now been able to participate in therapy and has been safe and secure with the foster family.

Given that history, we find that termination of the mother's rights is in the child's best interests.

2. *Six-month extension.* Because the foster family is not available to adopt, the mother argues that the six-month extension will be unintrusive for the child especially because the mother has shown "substantial growth" and "insight." The mother emphasizes that it is important that she has acknowledged that her previous actions were harmful to the child. She points to her participation in the services offered, including counseling. On top of that, the mother emphasizes how hard she has worked on improving the trailer she purchased so the child can have appropriate living conditions. We applaud the work the mother has done, but we also must look at what still needs to be accomplished to provide a safe, stable, and permanent home. And, as noted above, the mother overstates her progress. Examining the mother's late efforts to engage in services, the juvenile court noted that there was "no way to know how much change [the mother] is able and willing to make."

To extend the statutory time guidelines, the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child . . . will no longer

exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b).
On this request, the juvenile court was "unable to conclude that change could be
made within the next six months that would allow for [the child] to return to the
custody of [the mother]." We agree.

3. *Exception to termination under section 232.116(3).* On the mother's final
challenge, we note that the case worker testified that the child and mother "have a
good bond." Yet, the child's therapist opined that the child's "level of attachment
to anyone in general is difficult to discern, but certainly a termination of rights would
be difficult for [the child]." So, the mother asserts that she has established "that
there is clear and convincing evidence that termination would be detrimental at the
time due to the closeness of the parent-child relationship." "The factors weighing
against termination in section 232.116(3) are permissive, not mandatory, and the
court may use its discretion, based on the unique circumstances of each case and
the best interests of the child, whether to apply the factors in this section to save
the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014)
(cleaned up).

"[T]he parent resisting termination bears the burden to establish an
exception to termination." *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). While the
mother and child have a good relationship, we must look at the amount of time that
the child has spent out of the mother's care and how much growth and stability the
child has gained outside of that relationship. That weighs against the strength-of-
the-bond argument. And in other cases, we rejected an extension of time "in part
because of all the uncertainty caused by [the parent's] only recent progress and
the court's inability to confirm her progress." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa

Ct. App. 2005). While the child has a good relationship and looks forward to seeing the mother, there have been occasions where the child's behavior deteriorated because of the mother's actions and statements. Thus, the mother has not met her burden to prove that a permissive exception to the termination of her rights should be applied.

**B. Father's Appeal.** The father argues that "the only concern" of HHS was his living situation and that because he has corrected that issue and has a suitable, stable, and safe home, his parental rights should not have been terminated. He points to the testimony of the HHS social worker that there were no concerns with the interaction between him and the child on the video calls. He contends the mother's actions are what placed this situation under the eye of HHS.

1. *Statutory grounds for termination.* The father asserts that the State failed to prove termination under Iowa Code section 232.116(1)(f) by clear and convincing evidence. Pursuant to this section a juvenile court may terminate parental rights when the child cannot be returned to the custody of the parent at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.M.*, 843 N.W.2d at 112 (citation omitted). At the time of the termination hearing, although the father had shown commitment to maintaining contact with the child once the foster care placement was made, he had never met the child in person, let alone assumed any parental responsibilities. He was offered fuel cards to make the trip from Arkansas to Iowa, but he did not have a driver's license and claimed not to

know anyone with a reliable vehicle who could drive him. Thus, he had no proven record that he was in a place or had the skills to have a child he had never met in person transition to his care. While video calls are essential to stay in contact, the skills associated with good parenting involve more than talking over the phone or computer. "[P]arental responsibilities include more than subjectively maintaining an interest in a child. The concept requires affirmative parenting to the extent it is practical and feasible in the circumstances." *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981). The father has not shown that level of involvement from the child's birth forward.

Yet, the father complains his home state failed to complete an Interstate Compact on the Placement of Children (ICPC) home study, after he corrected some of the previous deficiencies centered around his housing. He asserts that he was ready and able to provide care for the child, which the home study results should have supported. But the ICPC home study is done to assure the juvenile court that the out-of-state parent has adequate parenting skills along with stable and safe housing for the family. Here, the father submitted to three ICPC home studies in Arkansas and was rejected three times. An early ICPC report reflected "deplorable conditions" with the father's living arrangement, and that the child could not live there. His probation officer told the ICPC coordinator that he felt "strongly" that the father could not care for the child for a number of reasons. He told the HHS social worker that the father had "hygiene" issues as well and that the father was "constantly having law enforcement come out for fights with his neighbors."

A third attempt to obtain a passing home study was initiated in early June 2025. Because the father maintained he alleviated the housing concerns,

the coordinator did conduct a home inspection of the RV where the father now lived, noting he now had "working electric and running water." But, that same month, the coordinator could not reach the father for an interview, even though the coordinator contacted the father's girlfriend by email, who confirmed she would have the father contact the coordinator. After the father made no effort to contact the ICPC coordinator, on July 14, 2025, the coordinator reported that "due to failure to comply, this request [for a home study] has been denied."

On our de novo review, we find that the State presented clear and convincing evidence to show that the child could not, for the first time, be transferred to the custody of the father at the time of the termination trial.

2. *Best interests.* Next, the father argues the juvenile court failed to give reasons why termination of his parental rights was in the child's best interests. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests."). After a termination trial, the juvenile court may decide not to terminate parental rights if it finds there is clear and convincing evidence that CINA proceedings should continue. It can then enter an order to extend the time for reunification in accordance with Iowa Code sections 232.104(2)(b) and 232.117(5).

The father argues that although he has not been present in person with the child, the online visits go well and he has established a "true bond" with the child. The relationship has only recently been developed. *See P.L.*, 778 N.W.2d at 41 ("We do not find a closeness of the parent-child relationship. Father and daughter were just getting to know each other."). Arguing he lives out of state, he claims he

was never given an opportunity to serve in a caretaker role with the child. But as the juvenile court noted, there is no evidence that the father can meet the factors that frame our best-interests decision: protecting the child's safety and meeting the physical, mental, and emotional needs of the child. "In deciding whether to terminate parental rights based on a particular ground, we must give primary consideration to the child's safety, the best placement for furthering the long-term nurturing and growth of the child, and the physical, mental, and emotional condition and needs of the child." *In re D.W.*, 791 N.W.2d 703, 708 (Iowa 2010) (cleaned up). Here, the best interests of the child require a placement that can be safe, stable, and permanent. The father has not established the track record for that role given his limited contact with the child and inability to get past a home study.

3. *Additional time.* As a final contention, the father argues he should be given additional time to reunite with the child. After a termination trial, the juvenile court may decide not to terminate parental rights if it finds there is clear and convincing evidence that CINA proceedings should continue. It can then enter an order to extend the time for reunification in accordance with section 232.104(2)(b). The court may continue the proceedings for an additional six months if it finds "the need for removal . . . will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). On this record, we have no assurance that circumstances will be any different after a six-month extension and so we deny the father's request for more time.

**IV. Conclusion.**

For all the reasons set out above, we affirm the juvenile court's decisions terminating the mother's and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**